IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| VICKI MCCUSKER,<br>         Plaintiff<br><br>  v.<br><br>MICHAEL ASTRUE,<br>Commissioner of<br>Social Security,<br>         Defendant. | CIVIL NO. SKG-09-1771 |

**MEMORANDUM OPINION**

I.  Introduction

Plaintiff Vicki McCusker appealed defendant Social Security Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under 42 U.S.C. § 1381 et seq. The parties have filed cross motions for summary judgment, and plaintiff has alternatively moved to remand the case for further action by the Commissioner. (Paper Nos. 15, 18). This Court must uphold the Commissioner's "factual findings … if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); See also 42 U.S.C. § 405(g). A hearing is unnecessary. Local Rule 105.6.

For the reasons explained below, this court **DENIES** plaintiff's motions for summary judgment and remand, and **GRANTS** defendant's motion for summary judgment.

1

**II. Procedural Background**

Plaintiff filed concurrent applications for DIB and SSI on September 10, 2004. (R. 93-100). The Social Security Administration ("SSA") denied plaintiff's applications, and she chose not to appeal. Plaintiff filed a second application for DIB on March 19, 2007, alleging a disability onset date of November 1, 2004. (R. 101-102). The SSA determined that plaintiff was not disabled through her date last insured ("DLI") and denied her application, initially on May 18, 2007 (R. 48, 61-63) and upon reconsideration on August 2, 2007 (R. 49, 67-68). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (R. 69). The hearing was held on October 28, 2008 before ALJ Erin Wirth. (R. 18). The ALJ found that plaintiff was not disabled prior to her DLI and therefore denied her application for DIB. (R. 11-17). The Appeals Council subsequently denied plaintiff's request for review. (R. 1). Since plaintiff has now exhausted her administrative remedies, the case is ripe for review.

**III. Factual Background**

The Court has reviewed defendant's Statement of Facts, (Paper No. 18 at 2-5), and adopts it as generally accurate.

**IV. ALJ Findings**

The ALJ found that plaintiff's DLI was December 31, 2005, (R. 13), and then determined that plaintiff was not disabled prior to that date by following the five-step sequential evaluation process provided by 20 C.F.R. § 404.1520. (R. 13-17).

At step one, an ALJ must consider whether plaintiff has been engaged in substantial gainful activity since her alleged onset date. If so, the ALJ must conclude that plaintiff was not disabled during the relevant time period. 20 C.F.R. § 404.1520(a)(4)(i). Here, ALJ Wirth found that "[plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of November 1, 2004 through her date last insured." (R. 13). Therefore, she proceeded to step two.

At step two, an ALJ is to determine the medical severity of plaintiff's alleged impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A medically severe impairment is one which "significantly limits [plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). ALJ Wirth found that plaintiff suffered from a single severe impairment – diabetes mellitus[1] – prior to her DLI. (R. 13). The ALJ also noted that

---

[1] Diabetis mellitus is "a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance." <u>Dorland's Illustrated Medical Dictionary</u> ("Dorland's") 513 (31st ed. 2007).

plaintiff was diagnosed with Bell's Palsy[2] on June 14, 2006, and experienced facial paralysis associated with this condition. (R. 13). However, failing to find any evidence that Bell's Palsy existed prior to plaintiff's DLI and noting that "claimant did not [so] argue at the hearing," the ALJ refused to "consider the impact of this condition" or to "find Bell's Palsy as a severe impairment[.]" (R. 13). Finally, the ALJ noted that plaintiff "had gone through periods of depression" prior to her DLI. The ALJ did not consider plaintiff's depression a severe impairment, however, because "her alleged depression had no more than a minimal effect on her ability to function." (R. 14).

At step three, an ALJ must determine whether any of the severe impairments identified at step two – in this case, diabetes mellitus – meet the criteria, including specified durational requirements, of one or more of the impairments in the Listing of Impairments ("LOI"). 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). Here, the ALJ evaluated plaintiff's diabetes against the criteria provided under Listing 9.08 and found that plaintiff did "not reflect signs of neuropathy[3] demonstrated by significant and persistent

---

[2] Bell's Palsy involves "unilateral facial paralysis of sudden onset, due to lesion of the facial nerve and resulting characteristic distortion of the face." Dorland's at 1386.
[3] Diabetic neuropathy includes "any of several clinical types of polyneuropathy seen with diabetes mellitus; there are sensory, motor, autonomic, and mixed varieties. The most common kind is a chronic condition

4

disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station; or acidosis[4]; or retinitis proliferans[5]." (R. 14). Therefore, the ALJ concluded, plaintiff's diabetes mellitus did not meet the criteria listed under the LOI.

At step four, an ALJ must determine whether plaintiff had the residual functional capacity ("RFC") through her DLI to perform relevant past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 404.1560(b). Here, the ALJ found that plaintiff retained the RFC to perform light work, including the ability to "lift ten pounds frequently; 20 pounds occasionally, stand and walk for six hours in an 8-hour work day, and sit for six hours in an 8-hour workday from an exertional standpoint." (R. 14). In making this determination, the ALJ pointed to evidence showing that, prior to her DLI, plaintiff had excellent blood sugar control, was not hyperglycemic, and only exhibited "very early diabetic neuropathy." (R. 14). The ALJ briefly noted that

---

called symmetrical sensory polyneuropathy; it affects first the nerves of the lower limbs and often autonomic nerves; pathologically, there is segmental demyelination of peripheral nerves. An uncommon acute form is the ischemic variety, accompanied by severe pain, weakness, and loss of tendon reflexes. With autonomic involvement there may be orthostatic hypotension, nocturnal diarrhea, retention of urine, impotence, and small diameter of the pupils with sluggish reaction to light." Dorland's at 1287.

[4] Diabetic acidosis is "a type of metabolic acidosis produced by accumulation of ketone bodies resulting from uncontrolled diabetes mellitus." Dorland's at 17.

[5] Retinitis proliferans is "a condition sometimes resulting from intraocular hemorrhage, with neovascularization and the formation of fibrous tissue bands extending into the vitreous from the surface of the retina; retinal detachment is sometimes a sequela." Dorland's at 1658.

plaintiff's post-DLI treatment record reflected "the diagnosis of Bell's Palsy with facial paralysis, as well as hypertension, peripheral neuropathy, an infected finger, and depression." (R. 14). While acknowledging that the symptoms and pain plaintiff testified to at the hearing could be associated with her severe impairment, the ALJ questioned plaintiff's credibility in light of her RFC and self-reported activities of daily living. (R. 15). The ALJ relied more heavily on the opinions of non-examining state consultants, who "indicated that [plaintiff] has the necessary mental and physical residual functional capacity to perform work." (R. 16). The ALJ also based her step four findings on testimony from Dr. Andrew Beale, a vocational expert ("VE") present at the hearing, who suggested that plaintiff's past relevant work involved light exertion. (R. 16). In light of this testimony, the ALJ found that "claimant's residual functional capacity would not preclude her past relevant work." (R. 16).

At step five, the burden switches to the SSA to show that – given plaintiff's age, education, past work experience, and RFC evaluated against the Medical-Vocational Guidelines under 20 C.F.R. Part 404, Subpart P, Appendix 2 – plaintiff can meet the requirements of any other jobs that "exist in significant numbers in the national economy (either in the region where [the

plaintiff] live[s] or in several regions across the country)." 20 C.F.R. §§ 404.1560(c)(1), 404.1520(a)(4)(v). Here, the VE, in response to a hypothetical posed by the ALJ, testified that "[e]ven if [plaintiff] was limited to sedentary work and needed to elevate her feet occasionally and could only occasionally read a computer screen, … there were a number of jobs that could have been performed by [her]." (R. 17). The ALJ thus concluded that plaintiff was not disabled prior to her DLI.

**V. Standard of Review**

In reviewing SSA determinations, this Court is not called to try plaintiff's claims de novo. Rather, this Court is to leave factual findings to the SSA and to determine upon the whole record whether the SSA's decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "more than a mere scintilla of evidence but somewhat less than a preponderance." Craig, 76 F.3d at 589 (citing Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).

While this Court will not substitute its own findings of fact or weigh the evidence, Hays, 907 F.2d at 1456, "[a] factual

7

finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). In other words, while the ALJ's findings of fact are entitled to deference, her application of legal standards is not. Wiggins v. Schweiker, 679 F.2d 1387, 1396 (11th Cir. 1982).

This Court will also take the following additional considerations into account at review. First, hearings on applications for Social Security disability benefits are not adversary proceedings. Easley v. Finch, 431 F.2d 1351, 1353 (4th Cir.1970). Second, the Social Security Act is a remedial statute that is to be broadly construed and liberally applied in favor of beneficiaries and in order to advance congressional intent. Dorsy v. Bowen, 828 F.2d 246, 248 (4th Cir.1987). Finally, a plaintiff is entitled to a full and fair hearing, and any failure to have such a hearing may constitute sufficient cause to remand the case. Sims v. Harris, 631 F.2d 26, 27 (4th Cir. 1980).

**VI. Analysis**

On appeal, plaintiff contends that, in addition to diabetes mellitus, her pre-DLI conditions included "hypertension, bells palsy [sic], eczema and MRSA." (Paper No. 15 at 2). At step two the ALJ found diabetes to be plaintiff's only medically "severe"

8

impairment. (R. 13). Plaintiff argues that the ALJ failed to consider post-DLI reports – particularly a letter dated November 15, 2008 – by her treating physician. (Paper No. 15 at 7). These reports suggested, first, that plaintiff experienced a wider range of severe impairments prior her DLI and, second, that she suffered from debilitating symptoms associated with diabetes mellitus, which the ALJ should have considered at step three. (Id. at 6).

The Court finds that substantial evidence supported the ALJ's decision not to identify a wider range of medically severe impairments at step two. The Court also finds that substantial medical evidence in the record supported the ALJ's decision to accord less weight to plaintiff's treating physician's post-DLI reports and November 2008 letter. Finally, the Court finds that, at step three, the ALJ sufficiently weighed and ruled out the possible connection – if any – between the early signs of neuropathy reported by treating and consulting physicians during the pre-DLI period and plaintiff's subsequent allegations of much more debilitating neuropathy.

A. <u>At step two, substantial evidence supported the ALJ's decision to find diabetes as plaintiff's only severe impairment.</u>

Plaintiff contends that, at step two, ALJ Wirth should have identified Bell's Palsy and a number of other conditions as

9

medically severe disabilities. However, substantial evidence supported the ALJ's decision not to consider Bell's Palsy or any other of the alleged conditions as medically severe prior to plaintiff's DLI.

Under the Social Security Act ("the Act"), plaintiff bears the burden of showing that she suffered from a severe impairment prior to the expiration of her DLI. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B). See also Johnson v. Barnhart, 434 F.3d 650, 655-656 (4th Cir. 2005) (citing Henley v. Comm'r of Soc. Sec., 58 F.3d 210, 213 (6th Cir. 1995); Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1458 (9th Cir. 1995); Flint v. Sullivan, 951 F.2d 264, 267 (10th Cir. 1991)) ("to qualify for DIB, [a claimant] must prove that she became disabled prior to the expiration of her insured status"). The Fourth Circuit has affirmed the exclusion of impairments with post-DLI onset dates, where the plaintiff had neither contended that the impairments had existed prior to the lapse of her insured status nor provided any objective medical evidence that would support such a finding. Johnson, 434 F.3d at 656. Here, plaintiff's argument as to the existence of severe impairments other than diabetes mellitus suffers from similar evidentiary deficits as those pointed out by the Johnson court.

ALJ Wirth's determination that plaintiff's Bell's Palsy was not a medically severe impairment which existed prior to her DLI was supported by substantial evidence. Only in May 2006, months after her DLI, did plaintiff begin experiencing facial pain and paralysis. She was initially diagnosed with Bell's Palsy in June 2006. (R. 189-194, 204-210). At the hearing, Plaintiff's counsel conceded that plaintiff's Bell's Palsy symptoms and diagnosis postdated her DLI, and that diabetes was the only impairment present pre-DLI. (R. 22). Moreover, no objective medical evidence in the record – save for the treating physician's November 11, 2008 letter discussed <u>infra</u> – shows that plaintiff experienced facial paralysis and pain or any other symptoms associated with Bell's Palsy prior to her DLI. To the contrary, as a consulting neurological specialist reported in July 2006, "[o]ne day [plaintiff] woke up and discovered this difficulty affecting the left side of the face, trouble closing her left eye, facial asymmetry and numbness of the tongue…" (R. 205). Therefore, substantial evidence supported ALJ Wirth's conclusion that she could not "consider the impact of this condition on [plaintiff] and cannot find Bell's Palsy as a severe impairment that existed to the date last insured." (R. 13).

The ALJ was also correct to exclude depression, eczema, Methicillin-resistant Staphylococcus aureus (MRSA), and

hypertension as medically severe impairments that existed prior to the expiration of the plaintiff's DLI. In August 2003, a consulting physician reported that, although plaintiff had experienced depression, "she ha[d] been coping with her difficult circumstances extremely well without medication." (R. 180). No other evidence in the record suggests that plaintiff suffered from depression, debilitating or otherwise, prior to her DLI. Likewise, there is simply no medical evidence in the record – save for the treating physician's post-DLI reports – that would support a finding that plaintiff's eczema and MRSA were medically severe prior to plaintiff's DLI.

There was also substantial evidence in the record from which the ALJ could conclude that plaintiff's hypertension was not severe prior to her DLI. A consulting physician (Dr. Romanic) noted that plaintiff's hypertension was "under excellent control." (R. 183). Two state non-examining physicians (Dr. Hakkarinen and Dr. Brahim) likewise found no evidence of severe hypertension prior to plaintiff's DLI. (R. 441, 442). Accordingly, the Court finds that the ALJ's decision not to find hypertension as a severe impairment during the pre-DLI period was supported by substantial evidence.

> B. <u>At steps two and three, substantial evidence supported the ALJ's decision to accord less weight to plaintiff's treating physician's November 2008 letter and post-DLI reports.</u>

Plaintiff emphatically argues that the ALJ did not sufficiently weigh medical opinions from her treating physicians, including post-DLI reports and particularly a letter dated November 2008 and co-signed by her physician and treating nurse. The Court finds however, that the ALJ's decision to accord less weight to these opinions was supported by substantial medical evidence in the record.

SSA regulations and the case law of this Circuit instruct that "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other evidence in the record." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). At the same time, however, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. For example, the Fourth Circuit has affirmed an ALJ's decision to give less weight to the opinions of a claimant's treating physician, where other examining physicians disagreed with the treating physician's opinion, the treating physician's own reports conflicted, and the record contained an "absence of

clinically documented medical evidence" supporting the treating physician's opinions. Mastro, 270 F.3d at 178.

Here substantial evidence supported the ALJ's decision to accord less weight to the November 2008 letter from plaintiff's treating physician. The November 2008 letter from plaintiff's treating physician implies that plaintiff had suffered from neuropathy (and other debilitating diabetic pathologies), hypertension, Bell's Palsy, and a number of other conditions since they began treating her. (R. 447 (commenting that plaintiff had a "long history battling with uncontrolled [diabetes mellitus] and subsequent systemic disease" and that she "ha[d] been experiencing [profound fatigue, pain and swelling in the extremities] dating back to at least January 2004")). However, as the ALJ found, the record as a whole suggests that plaintiff showed only very early signs of neuropathy prior to her DLI. (R.14).

For example, a consulting physician (Dr. Lippman) examined plaintiff in August 2003 and found that, despite having to switch from using an insulin pump to insulin injections due to her loss of insurance, she had been "doing quite well" managing her diabetes mellitus:

> [Plaintiff's] hemoglobin A1cs[6] have continued in the 6 to 7% range. She is very conscientious in monitoring

---
[6] Blood sugar levels.

> and adjusting her insulin doses according to her carbohydrate intake and activity levels along with emotional state. She has generally been quite successful with this. *She has no problems with hyperglycemia and no substantial problems with symptomatic hypoglycemia either*. Consistent with that, she has had no evidence of microvascular complications. *She has had no complaints of peripheral neuropathy…*

(R. 179) (emphasis added). The same physician attributed plaintiff's chronic foot pain to an anatomical aberration, rather than diabetic neuropathy. (R. 180). Consulting physician Dr. Romanic characterized plaintiff as a "[w]ell-developed, well-nourished woman who is comfortable," and noted only "early diabetic neuropathy with preserved renal function." (R. 183). Non-examining state physician Dr. Brahim concluded that there was "no [evidence of disability] secondary to diabetes" and "no evidence of significant neurological deficits." (R. 442). While another consulting neurologist (Dr. Khan) found plaintiff "ha[d] peripheral neuropathy affecting the lower extremities," he examined plaintiff after her DLI and well outside the diagnostic timeline put forth by the treating physician in his letter. (R. 205-206). Finally, the treating physician's own pre-DLI treatment record from as far back as January 2004 through March 2005 includes multiple reports indicating plaintiff experienced only minor or no neurological symptoms associated with diabetes mellitus. (R. 296, 325, 339, 349). The Court finds, therefore,

15

that the ALJ did not err in finding that the treating physician's opinions expressed in his November 2008 letter were substantially outweighed by other, contrary medical evidence.

Furthermore, a physician's legal conclusions – i.e., a physician's conclusions as to whether a person is disabled – are not entitled to any evidentiary value. SSA regulations and Fourth Circuit law distinguish between a treating physician's legal conclusions and medical opinions. "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). However, because determinations of disability are administrative findings that often determine the outcomes of cases, legal conclusions are reserved to SSA. 20 C.F.R. § 404.1527(e). Legal conclusions include, inter alia, "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that we will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(e)(1). See also Morgan v. Barnhart, 142 Fed. Appx. 716, 722 (4th Cir. 2005) ("The ALJ is under no obligation to give a treating physician's *legal conclusions* any heightened

evidentiary value" (emphasis in original)). Therefore, the ALJ was justified in giving little to no weight to plaintiff's treating physician's statement in his November 2008 letter, (R. 447), that "[plaintiff] is 100% disabled."

> C. The ALJ was supported by substantial evidence in refusing to relate plaintiff's alleged post-DLI neuropathy symptoms back to the pre-DLI period.

Plaintiff could contend that the ALJ erred in refusing "relate back" her allegedly debilitating post-DLI neuropathy symptoms to the early signs detected by her treating physicians and some – though not all – consulting physicians. However, the Court finds that substantial medical evidence supported the ALJ's decision to do so.

When considering whether an identified severe impairment meets the requirements of a listing in the LOI, the Fourth Circuit has ruled that a claimant need not necessarily show that the full range of symptoms described in the listing manifested themselves prior to the expiration of her DLI. In a limited number of cases, an ALJ may infer that alleged post-DLI symptoms relate back to a severe impairment whose full range of symptoms had yet to openly manifest themselves during the pre-DLI period. See Neal for Pumphrey v. Bowen, 828 F.2d 1027, 1028 (4th Cir. 1987) (holding that a claimant need not demonstrate open and full manifestation of metastasis in order to meet the

requirements of the listing for malignant melanoma); Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985) (holding that a claimant alleging mental retardation need not provide a pre-DLI IQ test in order to meet the requirements of the relevant listing).

However, the Fourth Circuit's holdings in Neal for Pumphrey and Branham turned closely on the specific nature of the impairments in question (malignant melanoma and mental retardation, respectively) and are inapplicable here. The Neal for Pumphrey court's decision was predicated upon its understanding of the nature of plaintiff's specific condition. Neal for Pumphrey, 828 F.2d at 1028 ("[a]ssuming our understanding of metastasis[7] is correct…"). The appellant in that case had been diagnosed with malignant melanoma and had had a tumor removed from his right back – all prior to the expiration of his insured status. Neal for Pumphrey, 828 F.2d at 1028. In vacating the SSA's decision to deny him benefits, the Fourth Circuit pointed out that "[w]hen a metastasis openly manifests itself later, as here, it must mean that the initial surgery did not remove all of the cancerous cells and that the cancer had begun metastasizing prior to surgery, i.e., during the insured

---

[7] Metastasis involves "indefinitely progressive" cell growth. Once begun, metastatic cell growth inevitably "spreads throughout the body." Lawyers' Medical Cyclopedia § 38.5a.

period in this case." Id. For the malignant metastasis to have manifested itself after the DLI, the Neal for Pumphrey plaintiff must necessarily "have been in a metastatic condition during the time between his initial surgery and the appearance of the subsequent melanoma." Id.

The Branham court likewise based its decision on the specific nature of mental retardation. Appealing from a district court decision setting his mental retardation onset date to the date of his first IQ test, the Branham appellant argued that the onset of his mental retardation should be modified to a pre-DLI date. In granting this request, the Fourth Circuit pointed to the characterization of mental retardation in the LOI as "a lifelong condition," Branham, 775 F.2d at 1274, and reasoned that "there may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life," and "the fact that one was not earlier taken does not preclude a finding of earlier retardation." Id.

Diabetic neuropathy is fundamentally different from these conditions. It is neither a lifelong condition like mental retardation nor one whose symptoms cannot be mitigated through ongoing treatment. See LAWYERS' MEDICAL CYCLOPEDIA § 30A.17[C]. And unlike the appellant in Neal for Pumphrey, who actually had a

19

metastatic tumor removed prior to his DLI, plaintiff here either did not exhibit any neuropathic symptoms during the relevant time period or showed early, non-debilitating signs of the condition. (R. 179, 180, 183, 296, 325, 339, 349, 441, 442). Accordingly, the ALJ was supported by substantial evidence in refusing to infer a pre-DLI onset date for plaintiff's allegedly debilitating post-DLI neuropathy symptoms.

## VI. Conclusion

The parties have not contested the ALJ's findings at steps four and five, and the Court finds these to be legally sound and supported by substantial evidence. Accordingly, the Court **DENIES** plaintiff's motions for summary judgment and remand and **GRANTS** defendant's motion for summary judgment.

Date: 8/10/10                             /s/
                                    Susan K. Gauvey
                                    United States Magistrate Judge